UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
MITSUBISHI MOTORS NORTH AMERICA
INC.,

                              Plaintiff,

       - against -

GRAND AUTOMOTIVE, INC. d/b/a PLANET
MITSUBISHI,

                              Defendant.
---------------------------------------------------------X

FILED
CLERK

4/30/2018 4:54 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM
AND ORDER**

CV 18-814 (SJF) (SIL)

**FEUERSTEIN, District Judge:**

**I.    INTRODUCTION**

       Plaintiff, Mitsubishi Motors North America, Inc. ("MMNA" or "Plaintiff") brings the

instant action against Defendant Grand Automotive, Inc. d/b/a Planet Mitsubishi ("Planet" or

"Defendant") seeking damages and injunctive relief stemming from Planet's willful and

intentional operation of a Mitsubishi dealership at an unauthorized location and its improper use

of Mitsubishi trade names, trademarks, and trade dress at the unauthorized location in derogation

of the parties' duly executed Dealership Agreement and in violation of 15 U.S. C. § 1125(a),

New York General Business Law ("GBL") § 360-k as well as under common law causes of

action.  *See generally* Complaint ("Compl.").  Presently before the Court is Plaintiff's motion[1]

---
[1]    Plaintiff initially moved for relief by filing an Order to Show Cause ("OTSC") with
accompanying materials on February 13, 2018.  *See* DE 5-10.  On February 22, 2018, after
reviewing the papers submitted in support of and in opposition to Plaintiff's request for a
Temporary Restraining Order ("TRO"), the Court granted Plaintiff's application.  *See* DE 32
(Temporary Restraining Order).  In conjunction with the issuance of the TRO, the Court set

seeking a preliminary injunction [DE 3] in accordance with Rule 65 of the Federal Rules of Civil Procedure. For the reasons that follow, Plaintiff's motion is GRANTED.

## II.  FACTUAL BACKGROUND

The facts are drawn from the Complaint, the February 12, 2018 Declaration of John McElroy [DE 5] ("McElroy Decl."), the February 13, 2018 Declaration of Edward F. Maluf [DE 9] ("Maluf Decl."), the February 16, 2018 Declaration of Kanhiya K. Galani [DE 18] ("Galani Decl."), the February 19, 2018 Reply Declaration of Michael Beauchemin [DE 20] ("Beauchemin Reply Decl."), the March 5, 2018 Declaration of Michael Beauchemin [DE 49] ("Beauchemin Decl.") and the March 8, 2018 Declaration of Edward F. Maluf [DE 50] ("Maluf Supp. Decl.") as well as the documents attached thereto. *See Mullins v. City of New York*, 626 F.3d 47, 51-52 (2d Cir. 2010) (recognizing that in adjudicating a motion seeking preliminary injunctive relief, a district court may rely on affidavits, depositions and sworn testimony even when these materials include hearsay statements since "[t]he admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage.").

### A.  The Parties

MMNA is a California corporation that maintains its headquarters and principal place of business at 6400 Katella Avenue, Cypress, California 90630. McElroy Decl. ¶ 2. This location serves as MMNA's "headquarters" from which it directs all of its business activities and at which all board meetings are held. *Id.* MMNA has operated in the United States since 1981 and "its association with Mitsubishi motor vehicles and Mitsubishi motor vehicle parts, is known and recognized by consumers throughout the United States." *Id.* ¶ 3.

---

down a briefing schedule for Plaintiff's request for a preliminary injunction. Therefore, the Court construes DE 3 as a motion seeking affirmative relief.

Planet is a New York corporation with a principal place of business located at 306 Main Street, Hempstead, New York 11550. Compl. ¶ 4. Planet is owned by Kanhiya K. Galani ("Galani") and has been operating as an authorized Mitsubishi automotive dealership since 2012. Galani Decl. ¶¶ 1-2; McElroy Decl. ¶ 7. Planet sells both new Mitsubishi branded motor vehicles as well as used Mitsubishi and non-Mitsubishi motor vehicles. McElroy Decl. ¶ 7.

**B. MMNA's Business Model**

Since beginning operations in 1981, MMNA has primarily been engaged in the business of distributing Mitsubishi branded motor vehicles, parts and accessories through a network of authorized retail automotive dealerships within the United States. McElroy Decl. ¶¶ 3-4. In that regard, MMNA "authorizes local dealer[ships], including in New York . . . to sell and provide services relating to, among other products, Mitsubishi motor vehicles, parts, and accessories pursuant to Dealer Sales and Service Agreements." McElroy Decl. ¶ 6; *id.*, Exhibit ("Ex.") A (MMNA Dealer Sales and Service Agreement). Upon entering into a Dealer Sales and Service Agreement with a retail automobile dealership, MMNA expressly authorizes the limited use of "Mitsubishi Marks[2] and related trade names, trademarks, and trade dress in connection with [the sales of] new Mitsubishi motor vehicles." McElory Decl. ¶ 6; *id.*, Ex. A (MMNA Dealer Sales and Service Agreement Standard Provisions § 9). This limited authorization or license is nevertheless strictly "limited to the authorized location of the dealership from which the local dealer operates."[3] McElroy Decl. ¶ 6.

---

[2] The term "Mitsubishi Marks" includes the word mark "MITSUBISHI," United States Patent and Trademark Office ("USPTO") Registration No. 0,844,427 (registered in 1968) as well as the three-diamond logo design mark, USPTO Registration No. 0,931,665 (registered in 1972). McElroy Decl. ¶ 5.

[3] This authorized location is referred to as the "Dealership Premises" and is defined as "the place or places of business established by Dealer and approved by MMNA in accordance with

### C.  MMNA Enters into Dealership Agreement with Planet

Although Planet initially entered into a Dealer Sales and Service Agreement (the "Dealer Agreement") with MMNA in 2012, on October 31, 2016, Planet and MMNA entered into a subsequent Dealer Agreement which "authorized Planet to continue to operate as a Mitsubishi dealer for a term of three years."  McElroy Decl. ¶ 10; *id*., Ex. A; Galani Decl. ¶ 4.  The Dealer Agreement explicitly provides that Planet is authorized to operate a Mitsubishi motor vehicle dealership exclusively at 265 N. Franklin Street, Hempstead, New York 11550 (the "Dealership Premises").  McElory Decl. ¶ 12; *id*., Ex. A; Galani Decl. ¶ 9.  In accordance with Section 6 of the Dealer Agreement and Section 9 of the Dealer Sales and Service Agreement Standard Provisions ("Standard Provisions"), Planet was granted a "nonexclusive privilege of displaying and otherwise using the [Mitsubishi Marks] in connection with and for the purpose of identifying, advertising and selling MMNA Products; provided, however, that [Planet] shall promptly discontinue the display and use of any such [Mitsubishi Marks] . . . whenever requested to do so by MMNA" and that the display of the Mitsubishi Marks shall only be permitted on the Dealership Premises, unless "prior written approval" is granted by MMNA.  McElroy Decl., Ex. A.  In accordance with this limited license, "Planet installed signs at the Dealership Premises that included the [ ] three-diamond logo design mark and the words "Mitsubishi Motors," and used the trade name "Planet Mitsubishi" in conjunction with the operation of the dealership.  McElroy Decl. ¶ 14.

### D.  Planet Fails to Exercise it Lease Extension Option at the Dealership Premises

Planet leased the Dealership Premises from a third party (the "Franklin Street Owner").  McElroy Decl. ¶ 15.  Although Planet's lease covered a twenty (20)-year period, it nevertheless

---

Section 6 of the MMNA Dealer Sales and Service Agreement."  McElroy Decl., Ex. A (MMNA Dealer Sales and Service Agreement Standard Provisions § 2).

required that Planet affirmatively execute a renewal option every five (5) years. Maluf Supp. Decl., Ex. A (February 22, 2018 Transcript of Order to Show Cause ("Tr.") at 3-4). In order to exercise a each renewal option, Planet was required to notify the Franklin Street Owner of Planet's intent not later than sixty (60) days prior to the lease termination date. *Id.* at 4. Planet's operative lease termination date was August 6, 2017. *Id.*; *see* Galani Decl. ¶ 6. Notwithstanding this deadline, Planet failed to exercise its option to renew the lease within the required sixty (60)-day period. Maluf Supp. Decl., Ex. A (Tr. at 5). On July 20, 2017, after the renewal option window had closed, Planet received formal written notice from the Franklin Street Owner that its lease was set to expire on August 6, 2017. Galani Decl. ¶ 6. Although Planet approached the Franklin Street Owner in order to attempt to secure a lease renewal and/or extension, the Franklin Street Owner refused. *Id.* Planet was successful only in negotiating a one-time six-month lease extension which would expire on February 6, 2018 and that provided for "$2,500 per day liquidated damages in the event [Planet] held over" as well as a "confession of judgment entitling the [Franklin Street Owner] to summarily evict Planet [ ] if it did not vacate the [Dealership Premises] by the lease extension termination date." *Id.* at 7. At that time, however, Planet did not disclose to MMNA that its lease concerning the Dealership Premises would be expiring within six months. *See* McElroy Decl. ¶ 25; Galani Decl. ¶ 19.

### E. MMNA Denies Planet's Relocation Requests

On August 11, 2017, Planet notified MMNA "that it had located a potential new location at 444 West Merrick Road, Valley Stream, New York. Galani Decl. ¶ 10. MMNA did not formally consider this request until August 31, 2017—the date it received the required site plans from Planet regarding the proposed location. Beauchemin Reply Decl. ¶ 2; McElroy Decl. ¶ 17. By letter dated October 26, 2017, MMNA denied this request on the grounds that (1) the Valley

Stream location "has an inferior facility (even with the proposed renovations);" (2) "MMNA believes that the proposed relocation would weaken its dealer network on Long Island and harm Mitsubishi's competitive position in the New York Metro;" (3) Planet has "chronically underperformed since its appointment in 2012 based on a variety of MMNA sales performance and customer satisfaction metrics" and that "Mitsubishi reasonably believes that [Planet's] performance will deteriorate even further if it relocates to an inferior site with lower registration density;" and (4) the Valley Stream location is located in "an area where MMNA does not desire dealer representation and which would interfere with MMNA's ability to pursue its marketing plans in the Lawrence and Queens Village markets." Galani Decl., Ex. A (October 26, 2017 Valley Stream Location Denial Letter).

Following MMNA's October 26, 2017 rejection of Planet's relocation request, Planet, on December 7, 2017, filed a request for adjudication with the New York Department of Motor Vehicles (the "DMV") challenging MMNA's denial of its relocation request as "unreasonable" under New York Vehicle and Traffic Law Section 463.2(dd). McElroy Decl. ¶ 19. In conjunction with this request, Planet "disclosed the impending expiration of its lease for the Dealership Premises[.]" *Id*. ¶ 20.

On or about December 13, 2017, Planet "proposed to relocate its Mitsubishi dealership to 306 Main Street, Hempstead, New York (the "Unauthorized Location"). *Id*. ¶ 21; Galani Decl. ¶ 20. On January 17, 2017, MMNA issued a written denial of Planet's request on the grounds that "the Unauthorized Location is vastly inferior to Planet's authorized location because . . . it has insufficient space for the conduct of Mitsubishi dealership operations, does not have a high amount of consumer traffic, lacks easily accessible parking, and is not readily visible to

consumers." McElroy Decl. ¶ 22; Galani Decl., Ex. B (January 17, 2018 Hempstead Location Denial Letter).

On January 24, 2018, Planet withdrew its previously filed DMV adjudication request but filed a subsequent request on February 5, 2018 "challenging, among other things, MMNA's denial of Planet's request to relocate to the Unauthorized Location as 'unreasonable'" under New York Vehicle and Traffic Law Section 463.2(dd). McElroy Decl. ¶ 24; Galani Decl. ¶ 30.

### F. Planet Relocates to the Unauthorized Location

On February 7, 2018, Planet began operating its Mitsubishi dealership at the Unauthorized Location "without MMNA's authorization or approval." McElroy Decl. ¶ 25; *see* Galani Decl. ¶ 33. As a result, "Planet's operations at the Unauthorized Location are entirely unsanctioned and unmonitored by MMNA." Beauchemin Reply Decl. ¶ 5. While conducting business at the Unauthorized Location, Planet "is displaying and otherwise using the Mitsubishi Marks, portions of MMNA's corporate name including 'Mitsubishi' and 'Mitsubishi Motors,' and other Mitsubishi trademarks, trade names, and trade dress[.]" McElroy Decl. ¶ 28. In addition, Planet is utilizing "Mitsubishi trade names and trademarks to promote the Unauthorized Location on its website[.]" *Id*. at 30. On February 8, 2018, MMNA served Planet with a cease and desist letter demanding that Planet "cease immediately its use of the [Mitsubishi] Marks and Trade Dress, and otherwise comply with its obligations under the Agreement." Maluf Decl., Ex. A. Thereafter, on February 9, 2018, Planet, through counsel, "disagree[d] with [MMNA's] position" and indicated that it would take all available steps to "vindicate [its] rights." *Id*., Ex. B.

### G. MMNA Issues Planet a Termination Notice

On February 16, 2018, MMNA served Planet with a Notice of Termination based upon Planet having "substantially and materially breached the Agreement in a manner that warrants

and constitutes due cause for termination of the Agreement under several provisions of the Agreement, the [Standard Provisions] incorporated by reference into the Agreement [ ], and applicable New York law." Beauchemin Reply Decl., Ex. A (Termination Notice). The Termination Notice based its termination decision, in part, upon the fact that Planet was no longer conducting operations exclusively at the Dealership Premises, as required under "Section IV(A) of the Standard Provisions" and that Planet's "failure to maintain dealership operations at the Dealership Premises for seven (7) business days constitutes grounds for termination under both the Agreement and the New York Franchised Motor Vehicle Dealer Act." *Id.* In addition, in accordance with "Sections IV(F) and X(B)(1)(a) of the Standard Provisions to the Agreement, MMNA may terminate the Agreement for cause immediately upon the 'failure of [Planet] to keep its MMNA dealership operations, or any part thereof, open for business for a period in excess of five (5) consecutive business days,' and/or upon 'any change in the amount or usage of the Dealership Facilities . . . without prior written consent of MMNA.'" *Id.* Moreover, MMNA states that Section 463(d)(3) of the New York Vehicle and Traffic Law authorizes "a franchisor to terminate a dealer upon fifteen (15) days' written notice following the dealer's failure to 'conduct its customary sales and service operations for a continuous period of seven business days."[4] Thus, based on Planet's failure to maintain "customary sales and service operations at

---

[4]     Section 463(d)(3) states, in part, that "a franchisor may terminate its franchise with a franchised motor vehicle dealer upon at least fifteen days written notice upon the occurrence of any of the following: (i) conviction of a franchised motor vehicle dealer, or one of its principal owners, of a felony or a crime punishable by imprisonment which substantially adversely affects the business of the franchisor, or (ii) the failure of the franchised motor vehicle dealer to conduct its customary sales and service operations for a continuous period of seven business days, except for acts of God or circumstances beyond the direct control of the franchised motor vehicle dealer or when any license required by the franchised motor vehicle dealer is suspended for a period of thirty days or less, or (iii) insolvency of the franchised motor vehicle dealer, or filing of any petition by or against the franchised motor vehicle dealer under any bankruptcy or receivership law." VTL § 463(d)(3).

the Dealership Premises for at least seven consecutive business days" MMNA notified Planet of MMNA's "intent to terminate the Agreement effective 5:00 p.m. EDT on March 5, 2018 or fifteen (15) days from [Planet's] receipt of this notice, whichever is later." *Id.*

### H. Plaintiff Moves for a Temporary Restraining Order

On February 13, 2018, MMNA, by Order to Show Cause, moved this Court for a Temporary Restraining Order seeking to enjoin Planet from "(a) utilizing any Mitsubishi trade name, trademark, or trade dress at 306 Main Street, Hempstead, New York 11550 . . . and (b) operating a Mitsubishi dealership at the Main Street Location, except that [Planet] may sell used motor vehicles at the Main Street Location." DE 3 (Proposed Order to Show Cause). Upon the issue being fully briefed and after conducting a hearing on February 22, 2018, the Court substantially granted Plaintiff's TRO request and directed full briefing on whether the TRO should be converted into a Preliminary Injunction. *See* DE 26, 32 (TRO).

### III. PLAINTIFF'S MOTION SEEKING A PRELIMINARY INJUNCTION

### A. Legal Standard

In general, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits,[5] that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008); *see Otoe–Missouria Tribe of Indians v. New York State Dep't of Fin.*

---

[5]     Where a preliminary injunction requires an affirmative act or mandates a specific course of conduct (as opposed to maintaining the *status quo*), the "injunctive relief is understood to be mandatory" requiring the application of a "clear" or "substantial" likelihood of success on the merits. *Chobani, LLC v. Dannon Co., Inc.*, 157 F. Supp. 3d 190, 200-01 (N.D.N.Y. 2016) (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995)).

*Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quotations and citation omitted) ("In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in [its] favor. . . ."); *Central Rabbinical Congress of United States & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014); *Barsoumian v. Univ. at Buffalo*, 594 F. App'x 41, 43 (2d Cir. 2015). As preliminary injunctive relief constitutes an "extraordinary remedy," a plaintiff is required to "carry the burden of persuasion by a clear showing for each factor." *Abbott Labs. v. Adelphia Supply USA*, No. 15 CV 5826, 2015 WL 10906060, at *5 (E.D.N.Y. Nov. 6, 2015), *aff'd sub nom. Abbott Labs. v. H&H Wholesale Servs., Inc.*, 670 F. App'x 6 (2d Cir. 2016)

### B. Application to the Facts

#### 1. Irreparable Harm

"[I]irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, and . . . the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *T-Mobile Ne. LLC v. Water Auth. of W. Nassau Cty.*, 249 F. Supp. 3d 680, 683 (E.D.N.Y. 2017) (quoting *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66–67 (2d Cir. 2007) (internal quotation marks and citations omitted)); *see Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). In order to satisfy the irreparable harm requirement, "[p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd.*,

481 F.3d at 66 (internal quotation marks omitted); *see Faiveley Transp. Malmo AB*, 559 F.3d at 118; *Kraft Foods Glob., Inc. v. Starbucks Corp.*, 411 F. App'x 428, 429 (2d Cir. 2011) ("In order to obtain a preliminary injunction, the movant must show, *inter alia,* "that irreparable injury is *likely* in the absence of an injunction.") (emphasis in original). In analyzing whether irreparable harm exists, courts have considered whether the plaintiff has shown that: "(1) 'he is likely to suffer irreparable injury in the absence of an injunction'; (2) 'remedies at law, such as monetary damages, are inadequate to compensate for that injury'; (3) the balance of hardships tips in his favor; and (4) 'the public interest would not be disserved by the issuance of a preliminary injunction.'" *Brooklyn Heights Ass'n, Inc. v. Nat'l Park Serv.*, 777 F. Supp. 2d 424, 435 (E.D.N.Y. 2011) (quoting *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F.Supp.2d 616, 620 (S.D.N.Y. 2010)); *see 7-Eleven Inc. v. Khan*, 977 F. Supp. 2d 214, 234 (E.D.N.Y. 2013).

This reasoned analysis aligns with the Second Circuit's pronouncement that courts "must *not* adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (emphasis added) (parenthetical omitted) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-393, 126 S. Ct. 1837, 1840, 164 L. Ed. 2d 641 (2006)); *see Kraft Foods Glob., Inc.*, 411 F. App'x at 429; *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 141 (E.D.N.Y. 2011) (applying *Salinger* to trademark action and recognizing that "[t]he *Salinger* court warned that courts, in analyzing the irreparable harm prong, must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm. . . ."); *Abbott Labs.*, 2015 WL 10906060, at *8 (same); *Jones v. Nat'l Conference of Bar Examiners*, 801 F. Supp. 2d 270, 286 (D. Vt. 2011) (recognizing in context of civil rights action that "[i]n assessing the possibility of irreparable harm, courts "'must not adopt a categorical or general rule or presume that the plaintiff will

suffer' such harm, but instead must actually consider the injury the plaintiff will suffer if he or

she loses on the preliminary injunction but ultimately prevails on the merits'") (quoting *Salinger*,

607 F.3d at 80); *Weinstein v. Krumpter*, 120 F. Supp. 3d 289, 297 (E.D.N.Y. 2015) (same);

*Burroughs v. Cty. of Nassau*, No. 13-CV-6784, 2014 WL 2587580, at *8 (E.D.N.Y. June 9,

2014); *Barrett v. Volz*, No. 2:16-CV-209, 2016 WL 4082640, at *8 (D. Vt. Aug. 1, 2016)

("Courts analyzing whether a party has satisfied the exacting standard of 'irreparable harm' must

not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable

harm"); *see also Chobani, LLC*, 157 F. Supp. 3d at 204 (observing that "presumption of

irreparable harm deviates from the traditional principles of equity, which require a movant to

demonstrate irreparable harm") (quoting *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765

F.3d 205, 216 (3d Cir. 2014)).[6]

### i.    Irreparable Injury

Although irreparable injury can no longer be presumed in the wake of the Second

Circuit's pronouncement in *Salinger*, "it remains true that '[i]rreparable harm exists in a

trademark case when the party seeking the injunction shows that it will lose control over the

reputation of its trademark pending trial, because loss of control over one's reputation is neither

calculable nor precisely compensable.'" *Vox Amplification Ltd.*, 2014 WL 558866, at *14

---

[6]      Despite the fact that *Salinger* involved a preliminary injunction within the context of a
copyright action, the Second Circuit nevertheless recognized that it saw "no reason that [the
principles set forth in the Supreme Court's decision in] *eBay* would not apply with equal force to
an injunction in *any* type of case." *Salinger*, 607 F.3d at 78 n. 7 (emphasis in original); *see, e.g.*,
*Grout Shield Distributors, LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 403 (E.D.N.Y. 2011)
("presumption of irreparable injury is no longer appropriate in a trademark case where plaintiff
can establish a likelihood of confusion"); *Vox Amplification Ltd. v. Meussdorffer*, No. CV 13-
4922, 2014 WL 558866, at *5 (E.D.N.Y. Feb. 11, 2014), *report and recommendation adopted*,
50 F. Supp. 3d 355 (E.D.N.Y. 2014).

(quoting *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343

(S.D.N.Y. Mar. 9, 2010)); *see Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.,* 778 F. Supp. 2d 261,

269 (E.D.N.Y. 2011) (same).  Having reviewed the documentary materials submitted in support

of Plaintiff's motion, the Court finds that MMNA has met its burden of establishing that it will

sustain irreparable injury if a preliminary injunction is not issued based upon the loss of control

over its reputation and goodwill caused by Defendant's continued use of MMNA's trademarks

and trade dress at the Unauthorized Location pending a final decision on the merits.[7]

MMNA contends that in light of Planet's use of its marks in derogation of the terms of

the underlying Dealership Agreement, it is "being injured by its inability to control the use of the

Mitsubishi trade names, trademarks, and trade dress" which will result in "harm to MMNA's

goodwill and [ ] reputation among consumers and among other Mitsubishi dealers authorized by

MMNA. . . ."  McElroy Decl. ¶ 33.  Specifically, MMNA sets forth the following reasons

concerning why and how it will suffer direct and palpable injury in the event Planet is permitted

to continue utilizing the MMNA marks during the merits phase of this litigation:  (1) "consumers

and dealers will believe that MMNA has authorized and approved Planet and its commercial

activities, including to operate, and utilize the Mitsubishi trade names, trademarks, and trade

dress, at the Unauthorized Location;" (2) "if MMNA is not able to control the use of its trade

names, customers may come to identify MMNA's trade name with products or dealership

locations[8] that do not meet MMNA's standards, which will, in turn, damage MMNA's reputation

_____

[7]    In light of the fact that the "MITSUBISHI" word mark and the "three-diamond logo" design mark have been registered with the USPTO since 1968 and 1972 respectively, there can be no genuine dispute that MMNA, as the exclusive licensee of these marks in the United States since 1981, has garnered a certain reputation and commensurate level of goodwill among consumers through the continued use of these marks.  *See* McElroy Decl. ¶ 5.

[8]    According to MMNA, the specific location of each Mitsubishi dealership is of importance since Mitsubishi seeks to have its dealerships located "near Mitsubishi's top

13

in the marketplace;" and (3) "if other dealers authorized by MMNA believe that MMNA has authorized Planet to operate a new location based upon Planet's use of . . . MMNA's trade names, other MMNA dealers may seek to change their dealership locations without prior approval from MMNA. This will, in turn, undermine MMNA's ability to maintain a viable dealer network in the United States and hinder its ability to recruit new dealers." *Id*. ¶¶ 33-35.

Although Planet asserts that MMNA's denial of its two separate requests to move its Dealership Premises to an alternate location were "unreasonable pursuant to NY VTL § 463.2(dd)," Galani Decl. ¶¶ 13, 24, it nevertheless concedes that "Planet['s] [ ] Dealer Agreement is *specifically tied* to the Franklin Street Location. . . ." *Id*. at 9 (emphasis added). In addition, the Dealer Agreement and Standard Provisions explicitly provide that the display of the MMNA marks is solely limited to the Dealership Premises unless prior written approval is obtained in order to deviate from this requirement. McElroy Decl., Ex. A (Dealer Agreement § 6); *see id*. (Standard Provisions § IX). Here, Planet does not dispute that it is displaying and otherwise using the marks at the Unauthorized Location in direct violation of the plain terms of the parties' agreements, thereby exceeding the scope of its limited license to use the marks. *See* Galani Decl. ¶¶ 33-38. In addition, given Planet's use of "self help" in unilaterally relocating its dealership and continuing to use the MMNA marks, there exists a very real possibility that consumers passing by or otherwise actively shopping at the Unauthorized Location will be misled and/or confused into believing that Planet is presently an authorized Mitsubishi dealership based upon its display and active use of the MMNA marks. In addition, the Unauthorized

_____

competitors" to enable consumers to "easily see the Mitsubishi dealership as they shop at other dealerships nearby, and thus may decide to browse or purchase Mitsubishi vehicles during the course of their shopping trip" and due to the fact that close "proximity to [other] dealerships ensures that consumers will associate Mitsubishi with other major vehicle brands, such that Mitsubishi will be recognized as being on par with those brands." Beauchemin Reply Decl. ¶ 10

Location may be perceived by at least some consumers as inferior to nearby locations occupied by Mitsubishi's direct competitors given that it is "located away from other dealerships on a quiet, primarily residential side street where no other new vehicle dealerships are located" coupled with the fact that the Unauthorized Location "lacks adequate space to display new and used vehicles for sale, or to provide adequate customer and employee parking, all of which are critical components of a Mitsubishi dealership." Beauchemin Reply Decl. . ¶¶ 11, 15. Indeed, while the Unauthorized Location is located on a residential street, Planet's previous Franklin Street Location was located on Hempstead's "'auto row' [which] is where Mitsubishi's primary competitors maintain dealerships, including Nissan, Jeep, Dodge, Honda, Toyota, Hyundai and Mazda." Beauchemin Reply Decl. ¶ 8. For these reasons and because "the use of a licensed mark beyond the scope of the license may deceive the public into thinking that the licensee is authorized to provide the goods or services offered under the mark when in truth it is not," *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 293 (S.D.N.Y. 2000), *aff'd*, 4 F. App'x 81 (2d Cir. 2001); *see also Microban Prod. Co. v. API Indus., Inc.*, No. 14 CIV. 41, 2014 WL 1856471, at *10 (S.D.N.Y. May 8, 2014) (quoting *Mktg. Products Mgmt., LLC v. Healthandbeautydirect.com, Inc.*, 333 F. Supp. 2d 418, 432 (D. Md. 2004) ("a franchisor or similar licensor of trademarked goods and services has a federally-protected, enforceable right to *impose conditions on* the use of its marks, and to *withdraw* its permission for the continued use of its marks, in interstate commerce so as to avoid a 'likelihood of confusion,' i.e., to protect its rights in maintaining the purity, quality, or soundness of its licensed goods and services" (internal citation omitted, emphases in original)), there exists a clear and present threat to MMNA's ability to affirmatively control the reputation and goodwill associated with its marks

pending resolution of the underlying merits of this litigation.  Therefore, MMNA has met its burden of establishing irreparable injury.

### ii.   Adequacy of Remedy at Law

This factor requires Plaintiff to show that no adequate remedy at law exists.  *See Republic of Panama v. Republic Nat. Bank of New York*, 681 F. Supp. 1066, 1069 (S.D.N.Y. 1988); *see also Firemen's Ins. Co. of Newark, New Jersey v. Keating*, 753 F. Supp. 1146, 1152 (S.D.N.Y. 1990) ("[A] showing of an inadequate remedy at law is a *sine qua non* of granting injunctive relief[.]").  In general, "[i]f an injury can be appropriately compensated by an award of monetary damages, then an adequate remedy at law exists, and no irreparable injury may be found to justify specific relief."  *Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC*, 582 F. Supp. 2d 616, 625 (S.D.N.Y. 2008) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)).  In the instant case, "[b]ecause the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable, remedies at law cannot adequately compensate Plaintiff for its injuries."  *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) (citing generally *Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991) ("The irreparable injury requisite for the preliminary injunction overlaps with the absent lack of adequate remedy at law necessary to establish the equitable rights.")). Therefore, remedies at law would be inadequate to compensate MMNA pending final adjudication on the merits.

### iii.      Balance of the Equities

A plaintiff must also establish "that the balance of equities tips in his favor."  *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013); *see VOX Amplification Ltd. v. Meussdorffer*, 50 F. Supp. 3d 355, 370 (E.D.N.Y. 2014).

MMNA submits that the scales "decidedly" tip in its favor given that: (1) "[t]he only 'burden' on Planet is that it will have to stop engaging in conduct to which it has no right to engage;" (2) any "'burden' on Planet is entirely self-inflicted" since "[i]t results solely from its failure to renew the lease at the Dealership Premises and its decision to move to the Unauthorized Location without authority to do so;" (3) "there is no *bona fide* burden on Planet because it loses hundreds of thousands of dollars a year on its new Mitsubishi vehicle sales, and its used vehicle sales are highly profitable;" and (4) "Planet's inability to utilize the valuable Mitsubishi Marks in an unauthorized manner to promote its used vehicle business is not a 'harm' that weighs against granting a preliminary injunction." Memorandum of Law in Support of Mitsubishi Motors North America, Inc.'s Motion for a Preliminary Injunction ("Pl.'s Mem.") at 20-21.

In response, Planet asserts that if it is forced to discontinue active display and use of the Mitsubishi marks at the Unauthorized Location it "will be greatly harmed" in light of the fact that: (1) "installing the signs, logo, and names at the [Unauthorized Location] cost Planet $40,000;" (2) all of Planet's "stationery, website, apparel, business cards, and other items contain the Mitsubishi trade dress, logo and name" and if preliminary injunctive relief were granted, Planet would be "forced to remove these materials" which will "cost Planet [ ] thousands of dollars;" (3) Planet's "business goodwill will [ ] be harmed . . . since [i]t will no longer maintain its status [as a] franchised new motor vehicle dealership;" (4) "both the lease at the [Unauthorized] Location and Planet['s] [ ] business license to operate in Hempstead require that it operate a new motor vehicle dealership;" (5) Planet will lose its $2 million line of credit since such credit is "dependant on it functioning as a new motor vehicle dealership;" (6) Planet's inventory will be "useless" in the event it "cannot hold itself out as a Mitsubishi-brand new

motor vehicle dealer;" and (7) Planet will have to terminate its fifteen (15) employees."  Galani

Decl. ¶¶ 38-44 (emphases omitted).

Initially, most of the countervailing "harms" that Planet contends will befall it if

preliminary injunctive relief is granted can be characterized as economic and therefore readily

compensable by Plaintiff in the event Defendant ultimately prevails at trial.  Indeed, as a

condition of the TRO, the Court required that Plaintiff put in place a bond in the amount of $2.5

million in order to cover any potential economic losses sustained by Planet during the course of

this lawsuit if Planet ultimately prevails on the merits.  *See* DE 33.  Therefore, Planet's assertion

of potential economic damages does not tip the balance of the equities in its favor.  In addition,

although Planet asserts that it too will suffer harm to its goodwill if it is "forced to operate as a

used car dealership only," Galani Decl. ¶ 40, such a statement lacks merit given that Planet sold a

total of only 99 new Mitsubishi vehicles for the calendar year ending December 2017 while in

comparison it sold a total of 442 used vehicles during the same period, accounting for 82% of its

total sales during that timeframe.  *See* Beauchemin Decl. ¶ 25.  Moreover, to the extent Planet's

goodwill argument relies on its status as a franchised Mitsubishi dealer, it conflates its own

goodwill in the "Planet" brand with the goodwill achieved by and belonging to MMNA and its

associated marks during the course of the last thirty-seven (37) years that these marks have been

in continuous use by MMNA.  Finally, having reviewed the remaining reasons provided by

Planet as to why the balance of the equities tip in its favor, the Court finds them to be similarly

unavailing.

Given the above and in light of the fact that Planet has only itself to blame for its present

predicament by failing to timely exercise the lease extension option at its former Franklin Street

location, the balance of equities tip in MMNA's favor.

### iv. Public Interest

The final factor requires that a plaintiff establish that "an injunction is in the public interest." *New York Progress & Prot. PAC*, 733 F.3d at 486; *see Silberberg v. Bd. of Elections of the State of New York*, 216 F. Supp. 3d 411, 416 (S.D.N.Y. 2016) ("the moving party must show that a preliminary injunction is in the public interest"). "The consuming public has a protectable interest in being free from confusion, deception and mistake." *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 541; *see New York City Triathlon, LLC*, 704 F. Supp. 2d at 344; *see Chobani, LLC*, 157 F. Supp. 3d at 205 ("[T]he public interest is served by preventing customer confusion or deception") (quoting *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1321 (11th Cir. 2010)). Because the consuming public may well be confused as to whether Planet is actually authorized to conduct Mitsubishi new car sales and service (as opposed to the sales and service of used vehicles)—including through the public display and active use of the MMNA marks at the Unauthorized Location—the public interest would be best served by the issuance of a preliminary injunction. *See ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002) (recognizing "the strong interest in preventing public confusion"); *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 505 (S.D.N.Y. 2013) ("Plaintiff has established that Defendants' actions are likely to cause consumer confusion. Therefore, the public interest would not be disserved by the issuance of a preliminary injunction."); *E.G.L. Gem Lab Ltd.*, 90 F. Supp. 2d at 293.

### 2. Likelihood of Success

#### i. Application of Heightened Standard

Planet asserts that "since MMNA's relief would affirmatively alter the current state of affairs, rather than maintain the *status quo*, it must show a clear or substantial likelihood of

success on the merits." Def.'s Opp'n at 4 (citing *Krispy Kreme Doughnut Corp. v. Satellite Donuts, LLC*, 725 F. Supp. 2d 389, 393 (S.D.N.Y. 2010)). Although not directly addressed by Plaintiff, a review of its Memorandum of Law illustrates that Plaintiff tacitly agrees with Defendant. *See* Pl.'s Mem. at 8 (asserting that "MMNA has a substantial likelihood of success on all of its claims for unfair competition. . . ."); 12 ("asserting that "MMNA also has a substantial likelihood of success on its breach of contract claim."). In light of the parties' convergent positions on this issue and based upon the fact that the relief being sought here requires Planet to engage in an affirmative act or specific course of conduct (*i.e.*, removal of all MMNA trademarks and trade dress from the Unauthorized Premises as well as Planet's website) which would alter the *status quo ante*, the heightened standard will be applied here. *See Chobani, LLC*, 157 F. Supp. 3d at 201 (recognizing that "preliminary relief may also order[ ] an affirmative act or mandate[ ] a specific course of conduct, such as requiring a defendant to turn over phone numbers featuring a tradename or to assign a trademark [.] In those cases, the injunctive relief is understood to be 'mandatory,' [as opposed to prohibitory] and the heightened standard applies.) (internal quotations and citation omitted) (first, second and third alteration in original); *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, No. 17-CV-05495, 2017 WL 5125771, at *7 (E.D.N.Y. Nov. 4, 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018) (recognizing that "a heightened standard is appropriate where: (i) an injunction is mandatory, or (ii) the injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.") (internal quotations and citation omitted).

### ii.  Unfair Competition Claims

Plaintiff's First, Third and Fourth causes of action assert claims for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), unfair competition under New York State common law and unfair competition under New York State General Business Law ("GBL") § 360-k.[9]  *See generally* Compl.  The primary purpose of the Lanham Act is to "regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce." 15 U.S.C. § 1127; *see Zimmerli Textil AG v. Kabbaz*, No. 14-CV-1560, 2015 WL 5821523, at *3 (E.D.N.Y. Sept. 30, 2015).  In that regard, the statute "protects the rights of the first user of a trademark, particularly where that mark is a strong one." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 742 (2d Cir.1998); *see Zimmerli Textil AG*, 2015 WL 5821523, at *3.  "Trademark law accomplishes this by barring a later user from employing a confusingly

---

[9]     Since "[c]ourts employ substantially similar standards when analyzing claims for trademark infringement [and unfair competition] under the Lanham Act, 15 U.S.C. § 1114(1)(a); false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); trademark infringement under New York common law; and unfair competition under New York common law," these claims will be analyzed concurrently.  *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 301 (E.D.N.Y. 2014); *see Richemont North Am., Inc. v. Huang*, No. 12 Civ. 4443, 2013 WL 5345814, at *5 n. 15 (S.D.N.Y. Sept. 24, 2013); *Allied Interstate LLC v. Kimmel & Silverman P.C.*, 2013 WL 4245987, at *5 (S.D.N.Y. Aug. 12, 2013) (quoting *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005)) ("It is well-established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims."); *Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 273 (E.D.N.Y. 2014) ("The elements of unfair competition under New York State common law closely parallel the elements of unfair competition under the Lanham Act, except that a plaintiff must show "either actual confusion or a likelihood of confusion, and there must be 'some showing of bad faith' on the part of the defendants."); *see also optionsXpress, Inc. v. optionsXpress Inc.*, No. 14-CV-956, 2014 WL 3728637, at *2 (S.D.N.Y. July 28, 2014) ("Because the analysis for trademark infringement under New York common law is the same as federal trademark analysis, the foregoing establishes liability under GBL § 360–k.") (citing *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 04–cv–2293, 2007 WL 74304, at *8 n. 13 (E.D.N.Y. Jan. 8, 2007)).

similar mark, likely to deceive purchasers as to the origin of the later user's product, and one that would exploit the reputation of the first user." *Id.*

Specifically, 15 U.S.C. § 1114(1)(a) prohibits the commercial use of "any reproduction, counterfeit, copy, or colorable imitation of [another's] registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Similarly, 15 U.S.C. § 1125(a) "prohibits any misrepresentation likely to cause confusion about the source of a product, in particular the use by any person of [] any . . . name . . . likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association . . . with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." *L'Oreal USA, Inc. v. Trend Beauty Corp.*, No. 11 Civ. 4187, 2013 WL 4400532, at *14 (S.D.N.Y. Aug. 15, 2013) (quoting 15 U.S.C. § 1125(a)) (third ellipses in original); *see Van Praagh*, 993 F. Supp. 2d at 301.

Although both of these statutory provisions have similar aims, 15 U.S.C. § 1114 is narrower, offering protection only to those marks that are registered with the United States Patent and Trademark Office while 15 U.S.C. § 1125(a) is a broader "federal unfair competition provision which protects unregistered trademarks[.]" *L'Oreal USA*, 2013 WL 4400532, at *14; *see Van Praagh*, 993 F. Supp. 2d at 301; *Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 2007 WL 74304, at *11 ("An unfair competition claim under Section 43(a) of the Lanham Act is conceptually broader than trademark protection . . . [and] extends not only to the name of the good, but to its overall presentation, or dress.") (internal quotations omitted) (ellipsis and brackets in original); *Int'l Diamond Importers, Inc. v. Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 513 (S.D.N.Y. 2014) (recognizing that a claim of unfair competition under the Lanham

Act "examines whether the public is likely to be misled into believing that the defendant is distributing products manufactured or vouched for by the plaintiff.").  An unregistered mark can qualify for protection under 15 U.S.C. § 1125(a) if it is able to qualify for registration as a trademark.  *See Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 414 (S.D.N.Y. 2012) (citing *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 213 n. 2 (2d Cir. 2003)).  Qualification for protection requires that a mark be "either [] (1) 'inherently distinctive,' where its intrinsic nature serves to identify its particular source; or (2) distinctive by virtue of having acquired a 'secondary meaning' in the minds of consumers." *Lopez*, 883 F. Supp. 2d at 414 (quoting *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 449 (S.D.N.Y. 2008)).  In addition, the mark "must also be 'used in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark'" and "must have been used in commerce, not merely adopted by the plaintiff." *Lopez*, 883 F. Supp. 2d at 414-15 (quoting *Gameologist Grp., LLC v. Scientific Games Int'l, Inc.*, 838 F. Supp. 2d 141, 154 (S.D.N.Y. 2011)) (emphasis omitted).

In order to establish a claim of unfair competition under the Lanham Act, a plaintiff must demonstrate "1) the trademark, trade name or trade dress is valid and legally entitled to protection, and 2) defendants' unlicensed use of the same or similar trademark, trade name, or trade dress is likely to create confusion concerning the origin of the goods or services." *Gluco Perfect, LLC v. Perfect Gluco Prod., Inc.*, No. 14-CV-1678, 2014 WL 4966102, at *18 (E.D.N.Y. Oct. 3, 2014) (citing *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003)); *see Victorinox AG v. B & F Sys., Inc.*, 114 F. Supp. 3d 132, 139 (S.D.N.Y. 2015), *aff'd sub nom. Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017); *Estate of Ellington ex rel. Ellington v. Harbrew Imps. Ltd.*, 812 F. Supp. 2d 186, 192 (E.D.N.Y.

2011) ("A party establishes liability under [15 U.S.C. § 1125(a) ] if it can demonstrate (1) that it has a valid trademark entitled to protection under the Act, and (2) defendant's actions are likely to cause confusion.") (internal quotation marks omitted).

Likelihood of confusion generally requires that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question, or are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark[.]" *Merck & Co. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 411 (S.D.N.Y. 2006) (internal quotations and citations omitted). In order to determine whether a mark is likely to cause confusion among consumers, courts generally rely upon the "well established" eight-factor balancing test enumerated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961); *see Merck & Co.*, 425 F. Supp. 2d at 411; *see Van Praagh*, 993 F. Supp. 2d at 301; *Sola Franchise Corp. v. Solo Salon Studios Inc.*, No. 14-CV-0946, 2015 WL 1299259, at *8 (E.D.N.Y. Mar. 23, 2015); *Victorinox AG*, 114 F. Supp. 3d at 140 ("As to consumer confusion, courts within this Circuit generally assess this claim by considering the eight factors set forth in *Polaroid. . . .*"). These factors include:

> (1) the strength of the plaintiffs [*sic*] mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the existence of actual confusion; (5) the likelihood that the plaintiff will 'bridge the gap' between the two markets; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the purchasers.

*Id*. (quoting *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 256–57 (2d Cir. 1987)). However, the *Polaroid* factors are generally not applicable in cases where a licensee or franchisee continues to use a trademark after its license to do so expires or is otherwise

terminated (*i.e.*, where an identical as opposed to a confusingly similar mark is at issue) as well as where a licensee or franchisee exceeds the scope of its license. *See Privado Mktg. Grp. LLC v. Eleftheria Rest. Corp.*, 13 Civ. 3137, 2017 WL 1167332, at *11 (S.D.N.Y. Mar. 27, 2017); *MyPlayCity, Inc. v. Conduit Ltd.*, 10 Civ. 1615, 2012 WL 1107648, at *20 (S.D.N.Y. Mar. 20, 2012) ("When an ex-licensee continues to use a mark after its license expires likelihood of confusion is established as a matter of law") (quoting *L & L Wings v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009)); *Halo Optical Prods., Inc. v. Liberty Sport, Inc.*, 6:14-cv-00282, 2017 WL 1082443, at *11 (N.D.N.Y. Mar. 22, 2017) ("[I]t is well established that when a licensee uses a mark beyond the scope permitted in the licensing agreement, the consumer confusion requirement is satisfied.") (citing *Dallas Cowboys Cheerleaders, Inc., v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.")); *Baskin-Robbins Ice Cream Co. v. D&L Ice Cream Co.*, 576 F. Supp. 1055, 1060 (E.D.N.Y. 1983) ("The sale by a licensee of unauthorized products, i.e., products outside the scope of the license, is likely to confuse the public into believing that such products are in fact manufactured or authorized by the trademark owner. Thus, such conduct constitutes trademark infringement.") (internal citation omitted). In these situations, the element of consumer confusion is established as a matter of law. *See L & L Wings*, 676 F. Supp. 2d at 188; *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 241 (S.D.N.Y. 2013); *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 399 (S.D.N.Y. 2000); *Southland v. Froelich*, 41 F. Supp. 2d 227, 243 (E.D.N.Y. 1999); *Baskin-Robbins Ice Cream Co.*, 576 F. Supp. at 1060; *see also Halo Optical Prods., Inc.*, 2017 WL 1082443, at *11 ("[W]hen dealing with an identical mark . . . courts are not necessarily required to analyze the *Polaroid* factors. . . ."); *Dunkin Donuts, Inc. v. Northern Queens Bakery, Inc.*, 216

F. Supp. 2d 31, 44 (E.D.N.Y. 2001) (finding *Polaroid* factors inapplicable where use of identical mark was at issue).

As concerns the first element, MMNA has asserted that it is the primary licensee of the Mitsubishi registered marks at issue in this action. McElroy Decl. ¶ 5 (setting forth the registered Mitsubishi marks and their associated USPTO registration numbers). In addition, Planet does not dispute that the Mitsubishi trademarks and trade names are valid and legally entitled to protection. Therefore, this element is satisfied. *See Dunkin Donuts, Inc.*, 216 F. Supp. 2d at 43 (recognizing that where mark has been "properly registered in accordance with the Lanham Act" this constitutes "*prima facie* evidence of a valid trademark") (internal citation omitted); *Century 21 Real Estate LLC v. Raritan Bay Realty, Ltd.*, No. CV-07-1455, 2007 WL 1385729, at *3 (E.D.N.Y. May 9, 2007); *MyPlayCity, Inc.*, 2012 WL 1107648, at *18 (presuming validity of mark where "[i]t [was] undisputed that [plaintiff] had a valid trademark").

Turning to the second element, likelihood of consumer confusion, MMNA asserts that confusion exists based upon the fact that "Planet is using the Mitsubishi Marks outside the location authorized by MMNA" with the result that it has exceeded the scope of its limited license. *See* Pl.'s Mem. at 11; Reply Memorandum of Law in Support of Mitsubishi Motors North America, Inc.'s Motion for a Preliminary Injunction ("Pl.'s Reply") at 5. In opposition, Planet does not directly address this factor but instead takes the position that because Planet has not actually been terminated by MMNA, this fact precludes MMNA from establishing a likelihood of success on its unfair competition claims. *See* Defendant's Response in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Def.'s Opp'n") at 5-9.

Having reviewed the underlying Dealer Agreement and Standard Provisions as well as the applicable sections of the New York Vehicle and Traffic Law, *see supra* at 3-9, the Court

finds that because Planet unilaterally moved the location of its dealership without first receiving

prior approval from MMNA, this affirmative act breached the underlying agreements, in part,

based upon Planet's failure to maintain customary sales and service operations at the Dealership

Premises for at least seven consecutive business days in direct contravention of both Section

IV(F) of the Standard Provisions as well as Section 463(d)(3) of the Vehicle and Traffic Law.

*See* McElroy Decl., Ex. A (Standard Provisions § IV(F)); VTL § 463(d)(3).  Based upon Planet's

*ultra vires* conduct (*i.e.*, unilateral relocation of its dealership), MMNA was vested with the

requisite contractual and statutory authority to revoke Planet's status as a franchisee as well as its

limited license to use the Mitsubishi marks.  *See* McElroy Decl., Ex. A (Standard Provisions

§ (X)(B)(1); VTL § 463(d)(3).  MMNA, in turn, acted within the scope of its authority by

serving Planet with a Notice of Termination dated February 16, 2018.  Beauchemin Reply Decl.,

Ex. A.  The Notice advised Planet that

> due to [Planet's] failure to conduct customary sales and service
> operations at the Dealership Premises for at least seven consecutive
> business days, MMNA hereby gives notice  of its intent to terminate
> the Agreement pursuant to Sections IV(F) and X(B)(1)(a) of the
> Standard Provisions to the Agreement, *effective 5:00 p.m. EDT on
> March 5, 2018 or fifteen (15) days from Dealer's receipt of this
> notice*, whichever is later.

*Id*. (emphasis added).  This language clearly and unequivocally served to terminate the

underlying contractual relationship between the parties as of the later of March 5, 2018 or

"fifteen days from [Planet's] receipt of [the termination] notice."  *Id*.  In addition, the Notice

further advised Planet that "[a]s of the earliest effective date of termination referenced above,

[Planet] must . . . discontinue use of all signs, trademarks, or trade names of MMNA used by it in

connection with the sale and distribution of MMNA's Products. . . ."  *Id*.  Therefore, to the extent

Planet asserts that its Agreement was not effectively terminated (thereby precluding Plaintiff's

likelihood of success on its unfair competition claims), such an argument is misplaced. *See* Def.'s Opp'n at 4 (conceding that although "Planet may allegedly be in violation of the Dealer Agreement . . . [a]bsent termination . . . Planet cannot be infringing on MMNA's trademarks" and that "to revoke Planet's trademark license, MMNA must terminate the Dealer Agreement and it has not").

Having determined that the Dealer Agreement has been effectively terminated by MMNA through service of the Termination Notice and based upon Planet's unauthorized relocation and continued use of the Mitsubishi marks at the Unauthorized Location, a strong likelihood of consumer confusion may be presumed as a matter of law. *MyPlayCity, Inc*, 2012 WL 1107648, at *20 ("When an ex-licensee continues to use a mark after its license expires likelihood of confusion is established as a matter of law"); *see Prudential Ins. Co. of Am. v. Ikomoni*, No. 96 CIV. 7272, 1996 WL 640915, at *1 (S.D.N.Y. Nov. 6, 1996) ("Prudential granted permission to OTRC to use those marks as long as the franchise agreement was in effect, but not beyond that point. The continued use of the name and marks of Prudential by OTRC will undoubtedly cause confusion to a public who will assume that OTRC continues to operate under the sponsorship of Prudential."); *Century 21 Real Estate LLC*, 2007 WL 1385729, at *3; ("Raritan continues to advertise on the internet and post signs in its building indicating that it remains a Century 21 franchisee, using the same marks as they did when they were properly franchised, despite being in violation of the franchise agreement, which explicitly provides that Raritan cease the use of the Century 21 Marks after termination of the agreement. Such usage will generate confusion among consumers as to the source of defendants' services and their relationship with Century 21. Accordingly, plaintiff has demonstrated that it will likely succeed on the merits."); *see also Precision tune, Inc. v. Pelter*, No. CV-89-0925, 1989 WL 50796, at *3

(E.D.N.Y. May 4, 1989) ("Where a plaintiff has sufficient evidence to support its claim that defendant has violated the provisions of a license agreement, defendant loses its limited right to use plaintiff's name or mark in any fashion once notice of termination is received.").  Therefore, MMNA has shown a clear and substantial likelihood that it will succeed on the merits under this theory.[10]

However, even if the Dealer Agreement had not been properly terminated by MMNA, this fact, in itself, would not preclude MMNA from establishing a likelihood of success as to its unfair competition claims since it need only establish the requisite elements of this cause of action, which does not include or otherwise require a showing that an underlying licensing agreement has been breached and/or effectively terminated.  *See Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 669 (2d Cir. 1968) (holding that "assuming all the requisite elements of infringement are established, a trademark licensor may succeed in a trademark infringement action against one who is still his licensee."); *Ikomoni*, 1996 WL 640915, at *2; *see also Gluco Perfect, LLC*, 2014 WL 4966102, at *18 (setting forth elements).  Therefore, even if the underlying Dealer Agreement had still been in place, it is undisputed that Planet was granted only a limited license to use and display the Mitsubishi marks at the Dealership Premises (the Franklin Street location) such that Planet's use and display of the marks at the Unauthorized Location consisted of behavior that exceeded the scope of the parties' licensing arrangement.

---

[10]     Although MMNA's unfair competition claims premised upon New York State law require an additional showing of bad faith, "[w]here an unambiguous trademark licensing agreement is terminated, and the licensee continues to [use] the trademark post-termination, a court can find bad faith as a matter of law.  *MyPlayCity, Inc.*, 2012 WL 1107648, at *21; *see L & L Wings*, 676 F. Supp. 2d at 190 (finding bad faith where defendants continued to distribute plaintiff's mark after their licensing agreement was unambiguously terminated, and plaintiff sent defendants three notices to cease use of plaintiff's mark).  It light of the unambiguous nature of the licensing agreement and subsequent termination in this case, such a finding is warranted here.

*See* McElroy Decl., Ex. A (Dealer Agreement § 6 (stating that use of marks is limited solely to Dealership Premises specified in Agreement unless prior written approval received from MMNA)); *see also* Galani Decl. ¶¶ 9, 38 (acknowledging that "the Dealer Agreement is specifically tied to the Franklin Street Location" and that despite this provision, Planet knowingly "installed [Mitsubishi branded] signs, logo and names at [the] [Unauthorized Location]"). Thus, Planet's unauthorized actions will likely result in "[t]he public's belief that [MMNA] sponsored or otherwise approved the use of the trademark [which] satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc.*, 604 F.2d at 205; *see Halo Optical Prods., Inc.*, 2017 WL 1082443, at *11 ("[W]hen a licensee uses a mark beyond the scope permitted in the licensing agreement, the consumer confusion requirement is satisfied."); *see also E.G.L. Gem Lab Ltd.*, 90 F. Supp. 2d at 293 ("[T]he use of a licensed mark beyond the scope of the license may deceive the public into thinking that the licensee is authorized to provide the goods or services offered under the mark when in truth it is not.). Thus, MMNA has satisfied the consumer confusion requirement on this independent basis and has therefore shown a clear or substantial likelihood that it will succeed on the merits as to its unfair competition claims.

### iii. Breach of Contract

Plaintiff's Second cause of action is for breach of contract. *See generally* Compl. In order to establish a claim sounding in breach of contract pursuant to New York law, a plaintiff must prove the following elements: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."[11] *DeFlora Lake Dev. Assocs., Inc. v. Park*, 654 F. App'x 9, 10 (2d Cir. 2016)

---

[11] "Under New York law, consequential damages for a breach of contract or warranty claim can include loss of goodwill, including the loss of customers, future profits, and harm to business reputation." *RIJ Pharm. Corp. v. Ivax Pharm., Inc.*, 322 F. Supp. 2d 406, 414 (S.D.N.Y. 2004);

(quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see Symquest Grp., Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 263 (E.D.N.Y. 2016). "Under New York law, 'the initial interpretation of a contract is a matter of law for the court to decide.'" *Maniolos v. United States*, 741 F. Supp. 2d 555, 566 (S.D.N.Y. 2010), *aff'd,* 469 F. App'x 56 (2d Cir. 2012) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998)) (additional citations omitted).

MMNA contends that it has a "substantial likelihood of success" as to this claim since it can establish all of the requisite elements. Pl.'s Mem. at 12-13. In opposition, Planet asserts that MMNA cannot meet the second element since, in Planet's view, "MMNA failed to perform under the Dealer Agreement first by unreasonably withholding its consent to two otherwise valid requests to relocate Planet's dealership." Def.'s Opp'n at 9. Notwithstanding Planet's argument, the Court respectfully disagrees. Although Planet may subjectively harbor the belief that MMNA unreasonably withheld consent concerning its proposed relocation requests, the record establishes that MMNA provided rational bases for both rejections of Planet's requests which the Court finds, at this stage, constitutes a reasonable exercise of MMNA's business judgment. *See supra* at 5-6 (setting forth MMNA's reasons for its rejections); *see generally* Beauchemin Reply Decl. Therefore, this argument is without merit. Contrary to Defendant's argument, Planet's unauthorized relocation and subsequent continued use of the Mitsubishi marks constituted the initial breach of the parties' agreement giving rise to MMNA's damages. As the record

---

*see Ciamara Corp. v. Widealab, Inc.*, No. 13 CIV. 1142 JMF, 2013 WL 6331927, at *4 (S.D.N.Y. Dec. 5, 2013) ("Under New York law, parties may recover for loss of future profits, goodwill, or harm to business reputation only if the damages were within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.").

establishes that (1) a valid contract existed between the parties, (2) that plaintiff performed by granting Planet the ability to operate a Mitsubishi franchise which included limited use of the Mitsubishi marks, (3) that Planet breached the agreement by moving the location of its dealership absent prior approval from MMNA and as (4) MMNA has alleged damages to its reputation and goodwill, the Court finds that at this stage of the proceedings, MMNA has established a clear or substantial likelihood of succeeding on the merits as to this claim.

## IV.   CONCLUSION

Based upon the foregoing analysis, and mindful that, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion," *NM v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247, 257 (E.D.N.Y. 2016), coupled with the fact that "[a]n award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief," *Moore*, 409 F.3d at 510, and after careful consideration of the record in this matter, Plaintiff's motion seeking preliminary injunctive relief is GRANTED. Therefore, the limitations as contained in the TRO, which have been secured by a $2.5 million bond, *see* DE 32, shall remain in full force pending a decision on the merits in this case.

                                                          **SO ORDERED.**

Dated:  Central Islip, New York
        April 30, 2018

                                                  /s/ Sandra J. Feuerstein
                                                  SANDRA J. FEUERSTEIN
                                                  U.S. District Judge